IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIED WORLD INSURANCE COMPANY, ALLIED WORLD SPECIALTY INSURANCE COMPANY, ALLIED WORLD NATIONAL ASSURANCE COMPANY, and UNITED STATES FIRE INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES KEATING, JONATHAN COHEN, JONATHAN P. COHEN, P.A., and SIAN KEATING,<br><br>Defendants. | CIVIL ACTION NO:<br><br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Allied World Insurance Company ("AW Insurance"), Allied World Specialty Insurance Company ("AW Specialty"), Allied World National Assurance Company ("AW National," and collectively with AW Insurance and AW Specialty, "Allied World"), and United States Fire Insurance Company ("USFIC") bring this action against Defendants James Keating ("Keating"), Jonathan Cohen ("Cohen"), Jonathan P. Cohen, P.A. ("Cohen, P.A.," and together with Cohen, the "Cohen Defendants"), and Sian Keating, and hereby allege as follows:

**TABLE OF CONTENTS**

**Page**

NATURE OF THE ACTION .................................................................................................1

THE PARTIES...................................................................................................................3

JURISDICTION AND VENUE ...........................................................................................4

BACKGROUND ................................................................................................................5

    Allied World And Its Surety Bond Business .........................................................5

    Allied World Hires Keating To Handle Surety Bond Claims................................6

    Keating Creates SR5 ............................................................................................8

    Keating Accepts Side-Payments From A Competitor Insurance Company .........9

    Keating And The Cohen Defendants Enrich Themselves At The Expense Of
        Allied World .............................................................................................10

    Keating Scams Allied World By Creating A Phony Company—American
        Construction—And By Authorizing Payments For Fictitious Work....................15

    Keating And Sian Keating Use SR5 Funds For Their Own Personal Benefit...................16

    Defendants' Deception Prevents Allied World From Discovering Their
        Misconduct................................................................................................16

FIRST CAUSE OF ACTION
    Civil RICO, 18 U.S.C. § 1962(c) *(against Keating, Cohen, and Cohen, P.A.)* .................17

    The SR5 Enterprise .............................................................................................17

    Participation In The SR5 Enterprise Through A Pattern Of Racketeering Activity..........18

    Predicate Acts Of Mail And Wire Fraud (Including Honest Services Fraud), And
        Money Laundering.....................................................................................20

    Injury To Plaintiffs..............................................................................................24

SECOND CAUSE OF ACTION
    Civil RICO, 18 U.S.C. § 1962(c) *(against Keating, Cohen, and Cohen, P.A.)* .................24

    The Keating-Cohen Enterprise ...........................................................................25

Participation In The Keating-Cohen Enterprise Through A Pattern Of Racketeering Activity ...............................................................................25

Predicate Acts Of Mail And Wire Fraud (Including Honest Services Fraud), And Money Laundering..................................................................28

Injury To Plaintiffs.................................................................................32

THIRD CAUSE OF ACTION
RICO Conspiracy, 18 U.S.C. § 1962(c), (d) *(against Keating, Cohen, and Cohen, P.A.)* ....................................................................................................32

FOURTH CAUSE OF ACTION
Fraud (*against Keating, Cohen, and Cohen, P.A.*) ............................................34

FIFTH CAUSE OF ACTION
Breach of Fiduciary Duty *(against Keating)* ........................................................35

SIXTH CAUSE OF ACTION
Breach of Fiduciary Duty *(against Cohen and Cohen, P.A.)* ............................................37

SEVENTH CAUSE OF ACTION
Aiding and Abetting Breach of Fiduciary Duty (*against Keating, Cohen, and Cohen, P.A.*).................................................................................................39

Keating Aided and Abetted the Cohen Defendants' Breaches of Fiduciary Duty ............39

The Cohen Defendants Aided and Abetted Keating's Breach of Fiduciary Duty.............40

EIGHTH CAUSE OF ACTION
Negligent Misrepresentation (*against Keating, Cohen, and Cohen, P.A.*).......................40

NINTH CAUSE OF ACTION
Unjust Enrichment (*against all Defendants*) ........................................................41

TENTH CAUSE OF ACTION
Conversion (*against Sian Keating*).....................................................................42

PRAYER FOR RELIEF ...............................................................................................43

JURY DEMAND ...............................................................................................43

**NATURE OF THE ACTION**

1.      This action arises out of the criminality of Defendant James Keating and his confederates, Defendants Jonathan Cohen and Sian Keating.  For seven years, Keating and Cohen abused the positions of trust and authority they held to enrich themselves at Plaintiffs' expense. As attorneys and fiduciaries of Allied World (and in the case of Sian Keating, a sworn law enforcement officer), Defendants knew that what they were doing was illegal, but they did it anyway to satisfy their greed.  Their deception was successful between 2014 and 2021, and would no doubt be ongoing today if Plaintiffs had not finally discovered Defendants' wrongdoing (or at least a portion of it) and fired Keating.

2.      The scheme cooked up among Keating and his co-conspirators was simple and brazen.  To begin, Keating exploited his role as the individual responsible for handling claims made on surety bonds issued by Allied World.  In this role as Allied World's claim handler, Keating hired the Cohen Defendants to act as Allied World's attorney.  Allied World paid the Cohen Defendants millions of dollars in fees for work that Allied World wrongly believed was being performed by faithful servants of the company.  In exchange, the Cohen Defendants (upon information and belief) paid Keating tens of thousands of dollars in kickbacks.  Upon information and belief, the Cohen Defendants funneled their kickback payments to Keating through a bogus company, SR5, LLC ("SR5"), which Keating and the Cohen Defendants used as an enterprise to further their fraudulent scheme.  Keating and his wife, Defendant Sian Keating, then used SR5's account at a Pennsylvania bank to pay personal expenses such as remodeling their kitchen.

3.      Keating and Cohen, who were former law school classmates, took this illicit scheme one step further.  Cohen—and, upon information and belief, Keating—created a company called Kodiak Asset Recovery, LLC ("Kodiak"), which Keating then retained to perform asset searches for claims he was handling for Allied World.  Kodiak charged double what Allied World's

legitimate asset search firm cost, without providing any additional value.  Keating knew Kodiak overcharged Allied World, and knew that Cohen was behind the company, but Keating retained Kodiak on dozens of claims to enrich Cohen and, upon information and belief, himself.  Upon further information and belief, Cohen used SR5 to funnel Keating his share of Kodiak's illicit profits.

4.      Keating also created another bogus company, American Construction & Industrial, LLC ("American Construction"), to further defraud Allied World.  Keating pretended to retain American Construction to perform consulting services for Allied World, and used fraudulent paperwork to authorize more than $1 million in payments to it.  In truth, American Construction performed no work, and had no existence other than on paper.  Upon information and belief, Keating used SR5 to launder Allied World's payments and use them for his own benefit, just as he had with his kickback schemes and the Kodiak scheme.

5.      Plaintiffs finally discovered the American Construction scheme and fired Keating in January 2021.  Plaintiffs then filed suit against him in the District of Connecticut to recover the funds Keating embezzled through the American Construction scheme (the "Connecticut Action").  Rather than dispute Plaintiffs' allegations, Keating asserted his Fifth Amendment privilege against self-incrimination.  Plaintiffs also continued to investigate Keating's wrongdoing, including by reviewing Keating's company emails and claim files, and by serving subpoenas on third parties.  The results of this investigation leave no doubt that Defendants' scheme of fraud and kickbacks existed.[1]

---

[1] This Complaint cites information that Plaintiffs have obtained through sources other than confidential third-party discovery.  Plaintiffs have requested a modification to the protective order entered in the Connecticut Action to allow Plaintiffs to submit confidential evidence obtained in third-party discovery under seal in this Court.  Keating has opposed that request, which remains

6.      Plaintiffs now bring this action to recover for the full scope of Keating's and Defendants' wrongdoing, including their violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et. seq.*

## THE PARTIES

7.      Plaintiff AW Insurance is a New Hampshire corporation with its principal place of business in New York, New York.

8.      Plaintiff AW Specialty is a Delaware corporation with its principal place of business in New York, New York.

9.      Plaintiff AW National is a New Hampshire corporation with its principal place of business in New York, New York.

10.     Plaintiff USFIC is a Delaware corporation with its principal place of business in Morristown, New Jersey.  All Plaintiffs are members of the same corporate family, and are ultimate subsidiaries of Fairfax Financial Holdings Limited.

11.     Defendant Keating is a natural person domiciled in Paoli, Pennsylvania.  He is a licensed attorney in Pennsylvania in active standing.

12.     Defendant Cohen is a natural person domiciled in Fort Lauderdale, Florida.  He is a licensed attorney in active standing in Pennsylvania and Florida.

13.     Defendant Cohen, P.A. is a Florida corporation with its principal place of business located in Fort Lauderdale, Florida.  Cohen is the president of Cohen, P.A.

14.     Defendant Sian Keating, Keating's wife, is a natural person domiciled in Paoli, Pennsylvania.  Sian Keating is a police officer employed by the Malvern, Pennsylvania police department.

---

*sub judice.*  If and when Plaintiffs' modification is granted, Plaintiffs intend to seek leave to amend this Complaint.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965(a), as this action arises under the laws of the United States—specifically, RICO.

16.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as all Plaintiffs are citizens of different states from all Defendants, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) as all claims against all Defendants in this action arise out of a common nucleus of operative facts; namely, Keating's years-long scheme to enrich himself at the expense of and in violation of his duties to Plaintiffs, with the active participation and involvement of Defendants, and through the use of SR5 to disguise illicit payments and channel them into Keating's pocket, as set forth more fully throughout this Complaint.

18.     This Court has personal jurisdiction over Keating and Sian Keating pursuant to 42 Pa. Stat. and Cons. Stat. § 5301, as they are Pennsylvania citizens.  This Court also has personal jurisdiction over Keating pursuant to 18 U.S.C. § 1965(a), as he resides and transacts his affairs in this district.

19.     This Court has personal jurisdiction over the Cohen Defendants pursuant to 18 U.S.C. § 1965(a), as the ends of justice require that these Defendants be brought before this Court to answer Plaintiffs' RICO claims against them.

20.     This Court also has personal jurisdiction over the Cohen Defendants pursuant to 42 Pa. Stat. and Cons. Stat. § 5322(b) as each of these Defendants has purposefully availed itself of the privilege of conducting activities within Pennsylvania or has purposefully directed its conduct into Pennsylvania, as set forth more fully throughout this Complaint.

4

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Eastern District of Pennsylvania.  Venue is also proper pursuant to 18 U.S.C. § 1965(a) because Keating resides and transacts his affairs in this district.

## BACKGROUND

### Allied World And Its Surety Bond Business

22.     Allied World is a global provider of insurance and reinsurance solutions.  Allied World provides property, casualty, and specialty insurance coverage, and has locations in the United States, Bermuda, the United Kingdom, Singapore, Canada, Australia, Hong Kong, Ireland, Malaysia, and Switzerland.

23.     One type of risk coverage that Allied World has offered is surety bonds.  Surety bonds guarantee that one party to a contract will fulfill its obligations to the other party.  Surety bonds often are issued in connection with construction contracts.  For example, a contractor may require a subcontractor to purchase a surety bond to guarantee that the subcontractor will complete the project satisfactorily (a "performance bond"), and the subcontractor in turn may require a surety bond to guarantee that it is paid for its work (a "payment bond").  In these contexts, the party whose performance is being guaranteed is called the "principal," the party requiring the surety bond is the "obligee," and the company issuing the surety bond is the "surety."

24.     If a principal fails to perform its obligations under a bonded contract, the principal or obligee under the surety bond can file a claim seeking to have the surety arrange for the job to be completed or the work paid for.  Once a claim is filed, it is typically assigned to a claims handler who will be responsible for evaluating and managing the claim.  The claim handler may elect to retain attorneys or consultants to advise him on the merits of the claim or to monitor ongoing work.  The claim handler might also retain an attorney to represent the surety during the claim process or,

if an action is filed, in litigation.  And the claim handler may also choose to retain a replacement contractor to finish work that should have been performed by the principal.

25.     For many years, Allied World offered surety bonds through its subsidiaries AW Insurance and AW Specialty.  Allied World exited this business in July 2019, when it transferred its surety bond business and employees to its affiliate USFIC, which trade under the registered trademark of Crum & Forster.  Since then, USFIC has managed the run-off of Allied World's portfolio of surety bonds.

**Allied World Hires Keating To Handle Surety Bond Claims**

26.     In February 2014, Allied World hired Keating to handle claims made on Allied World's surety bonds.  Keating was employed by Allied World's AW National subsidiary and held the title of Assistant Vice President, Surety Claims.  When Allied World transferred its surety business to USFIC in July 2019, Keating became a USFIC employee, retaining his title and responsibilities.

27.     Throughout his employment at Allied World and USFIC, Keating worked out of the companies' Philadelphia, Pennsylvania offices.

28.     Keating was (and remains) a licensed attorney in Pennsylvania.  After graduating from the Widener University School of Law in 2002, he worked for a series of law firms for over five years, focusing on construction litigation.

29.     In January 2008, Keating took his first job in the surety business, acting as surety counsel for First Sealord Surety.  In this position, Keating handled claims on payment and performance bonds, and managed outside counsel who worked on construction-related claims.  In February 2012, Keating moved to Star Surety (a division of Meadowbrook Insurance Group), where he worked as bond claims counsel, handling surety claims.  Keating held this position until February 2014, when he began working at Allied World.

30. When he started working at Allied World, Keating received the company's employment manual and acknowledged that he was "governed by [its] content" and that it was his "responsibility to familiarize [himself] and comply with all provisions of the Employee Manual."

31. Keating also acknowledged that he was bound by the company's Code of Business Conduct and Ethics—an acknowledgement that Keating repeated when his employment was transferred to USFIC. As recently as December 17, 2020, Keating certified that: he was "in compliance with the requirements of the Code"; he "d[id] not have any interest, affiliation or activity of any sort which would be a conflict of interest … under the Code"; he was "not an officer or director of any company … except as previously disclosed to and/or approved by the Board of Directors, Chairman or Secretary, as required by the provisions of the Code"; and he would "promptly disclose any facts which may appear to present a possible conflict of interest under the Code."

32. The Allied World and USFIC Codes of Business Conduct and Ethics provide, among other things:

   a. "Employees owe a duty to the Company to advance its legitimate interests when the opportunity arises. It is improper for officers, directors and employees: … to use information received performing services for the Company for personal gain, or to otherwise compete in any way with the Company in its legitimate interests."

   b. "Employees must not knowingly permit themselves to be placed in a position where their interests could become adverse to the Company's interests, including situations where the employee could be deemed to be competing with the Company."

7

c.    "Transactions involving the Company and … an entity in which an employee has a material interest must be brought to the attention of the employee's supervisor to determine if the transaction poses a perceived, potential or actual conflict of interest."

d.    "Employees must obtain written approval from their supervisor before accepting outside employment or serving as a director, trustee, officer, owner, partner or consultant of a for-profit organization, regardless of whether compensation in any form is received."

e.    "Every director, officer and other employee of the Company should avoid any situation where the personal interest of such director, officer or employee conflicts, or may appear or be likely to conflict, with any interest of the Company."

f.    "[N]o such officer, director, or employee shall either take for him or herself, any opportunity discovered through his or her employment or affiliation with the Company, or use corporate property, information, or position for his or her personal gain."

g.    "No director, officer or other employee shall participate on behalf of the Company in any negotiations or dealings of any sort with any non-affiliated person, firm, corporation, or entity, in which he or she has, either directly or indirectly, an interest."

**Keating Creates SR5**

33.    Unbeknownst to Allied World, Keating never intended to comply with the company's ethical guidelines. Instead, from the moment he was hired, Keating began to scam Allied World out of more than $1 million in improper compensation and outright embezzlement.

8

34. Keating laid the foundations of his years-long scheme in November 2013—a month before he applied to work at Allied World—when he formed SR5. Although SR5 purports to be a legitimate company, upon information and belief, it is in fact nothing more than a vehicle Keating created to facilitate his fraudulent scheme. SR5 has no offices or online presence. And SR5's publicly available Certificate of Organization names Keating as the company's organizer and lists Keating's home address in Paoli, Pennsylvania as the company's registered office. But SR5 did not need to be a legitimate operation to be useful for Keating—all it needed was a name and bank account that Keating could use, upon information and belief, to channel funds into his pocket. Consequently, on April 1, 2014 (two months after he began working at Allied World) Keating opened a bank account for SR5, doing business as Surety Risk Solutions, at a TD Bank branch in Pennsylvania. Keating submitted a formal resolution of SR5 to open the account, which he signed as SR5's "Owner."

35. Plaintiffs' company policies and Keating's fiduciary duties to his employers required him to disclose to Plaintiffs the existence of SR5 and Keating's ownership interest in the company. He never did. The reason for Keating's concealment is obvious—for the next seven years, Keating used SR5 as a front to scam Allied World and conceal improper payments.

**Keating Accepts Side-Payments From A Competitor Insurance Company**

36. Beginning in January 2014, Keating (through SR5) also purportedly worked as a third-party administrator on a competitor insurer's surety claims. (A third-party administrator is an outside person or entity that manages the administration of claims for the insurance company that issues the policy or surety bond.) Keating (through SR5) continued this work for years after he began working at Allied World—a competitor company in the surety bond space. Upon information and belief, Keating received hundreds of thousands of dollars in payments for this purported work, which were sent to SR5 to disguise Keating's wrongdoing.

9

37.     Keating's moonlighting plainly violated the fiduciary duties he owed to his employers at Allied World and USFIC.  And because Keating worked closely with the underwriters of Allied World's and USFIC's surety bonds, Keating was in a position to and may have disclosed trade secrets—including pricing information—to this competitor.

**Keating And The Cohen Defendants Enrich Themselves At The Expense Of Allied World**

38.     Keating's first two scams must have netted him hundreds of thousands of dollars in illicit compensation.  But it was not enough.  So Keating next formed an enterprise with Cohen and Cohen's law firm, Cohen, P.A., to steal even more from Allied World.

39.     Keating and Cohen knew each other before Keating joined Allied World.  The two were classmates at the Widener University School of Law, where they both graduated in 2002.  After graduation, Cohen moved to Florida, where he established Cohen, P.A. in 2014.  Cohen focused his practice on surety and construction matters.

40.     In January 2015, Keating retained Cohen and his firm to represent Allied World in connection with numerous surety and performance bond claims on bonds issued to Progressive Plumbing, Inc., one of which eventually went to trial.  Cohen had not previously represented Allied World, and Keating retained his firm without soliciting bids from other attorneys.

41.     When Cohen and his firm began to represent Allied World, they agreed to adhere to the Allied World North American Litigation Management Guidelines, which Keating provided to Cohen by email.  These Guidelines required Cohen and his firm to disclose any actual or potential conflicts of interest to Allied World "prior to beginning a matter or as soon as the conflict or potential conflict becomes known."

42.     But Cohen and his firm flaunted their obligations and concealed a significant conflict from Allied World.  Upon information and belief, Cohen and his firm made payments to

10

Keating through SR5 totaling hundreds of thousands of dollars over the course of more than five years.  Upon information and belief, these payments were nothing more than kickbacks that Cohen and his firm paid to Keating—through SR5—in exchange for the work Keating continued to assign on behalf of Allied World, and to further their enterprise's illicit purpose to steal from Plaintiffs.  The value of these payments should have inured to Allied World in the form of reductions in the Cohen Defendants' fees.  And upon information and belief, Cohen and his firm recouped the kickbacks they paid to Keating by fraudulently overcharging Allied World for work the company performed on Allied World claims.

43.     Keating repeatedly retained Cohen and his firm to represent Allied World.  In fact, in October 2015, Keating set up a number of "Rapid Response teams" of attorneys and consultants that could be quickly retained to represent Allied World on surety claims without the need for a competitive bidding process or additional oversight.  Keating named Cohen as Allied World's go-to attorney for the Southeast region.

44.     Keating's preferential treatment was extremely lucrative to Cohen and his firm.  Thanks to Keating's retentions of Cohen and his firm, Allied World has paid the Cohen Defendants a total of at least $3,467,103.63 between February 2015 and May 2021 via checks sent through interstate mail and via interstate wire transfers.

45.     After nearly two years of scamming Allied World, Keating and Cohen grew even more brazen when Cohen and (upon information and belief) Keating created an entity called Kodiak Asset Recovery, LLC.

46.     The background of this scheme involves Allied World's use of asset search firms.  Surety claims often involve efforts to hunt down assets of principals and other relevant parties, and perfecting security interests on them.  In fact, one of the first emails Keating sent to Cohen

11

during his representation of Allied World was to give him the contact information for the firm Allied World used for asset and bank account searches.

47.     The firm Allied World used had over 30 years of experience in the field and employed licensed private investigators to conduct searches.  As of early 2015, the asset search firm Allied World employed charged $250 for asset searches of an individual, and $500 for a business entity.

48.     Keating and Cohen wanted that money for themselves.  Therefore, on November 18, 2016, Cohen registered the domain name kodiakar.com.  Three days later, on November 21, 2016, Keating wrote to the address info@kodiakar.com to request pricing information for asset searches and UCC filings.  Cohen himself responded later that day using the same kodiakar.com email address, confirming that Keating was well-aware that Cohen was behind Kodiak.

49.     Cohen quoted Kodiak's fees as $450 for personal asset searches and $1,000 for corporate asset searches—double the amount charged by Allied World's existing asset search firm. No reasonable employee, let alone a fiduciary, would agree to let his employer pay double the price for a service it was already receiving from a reputable vendor.  But on November 22, 2016, Keating retained Kodiak to perform asset searches on behalf of Allied World.  Keating would use Kodiak on over 100 occasions on dozens of claims over the next four years to perform asset searches and UCC filings for Allied World.

50.     Upon information and belief, the asset searches Kodiak claimed to perform were simply LexisNexis searches branded with a Kodiak cover page.  The true cost to perform these searches was a small fraction of the sum Kodiak billed to Allied World.

51.     Between March 2017 and December 2020, Allied World made at least 108 payments to Kodiak totaling at least $339,950.39 via checks sent through the mail.  If Keating had

12

used Allied World's former asset search firm, Allied World would have paid a fraction of that cost for the same services. As a result, each and every one of these 108 payments was a product of fraud, and Kodiak had no justification to charge the outrageous fees it billed.

52. In reality, Kodiak has never been a legitimate company. The website that Cohen registered never contained any content according to website images maintained by the Internet Archive. Indeed, Kodiak was not formally created until December 30, 2016—a month after Keating sent his email asking for a fee quote.

53. Cohen's interest in the company is confirmed by its Certificate of Formation, which Cohen himself signed. Cohen's firm, Cohen, P.A., actively participated in the Kodiak scam. Among other things, Kodiak operated out of Cohen, P.A.'s offices, and a Cohen, P.A. paralegal did much of Kodiak's work. Upon information and belief, Keating also had an ownership stake in Kodiak—and Keating presumably received payments (through SR5) from Kodiak in exchange for directing Allied World's asset search work to Kodiak.

54. Beyond these numerous fraudulent schemes, and in furtherance of the overarching enterprise to steal from Plaintiffs, Keating protected Cohen and his firm from Allied World's inquiries into overbilling. In February 2019, Keating's supervisor emailed him to flag numerous instances in which Cohen and his firm had overbilled Allied World. Within minutes, Keating forwarded the email to Cohen and to discuss the matter that day. Following his consultation with Keating, Cohen prepared a memo that tried to address the instances of overbilling that Allied World had identified. When that memo failed to mollify Allied World, Keating again consulted with Cohen to revise the memo. Keating's and Cohen's collaboration was successful and Allied World dropped its investigation into Cohen's billing practices. The Cohen Defendants were then free to fraudulently overbill Allied World to recoup the kickback payments made to Keating.

55.     Keating's and Cohen's participation in the enterprise deepened the personal connection they had since their law school days.  The two were co-presenters of a talk on surety bond notice requirements at the October 2017 National Bond Claims Seminar organized by the National Bond Claims Association.  Keating and Cohen vacationed together in Key West in December 2018.  Keating and Cohen must have used these meetings, and others, to conspire about the operation and management of their enterprise to enrich themselves at the expense of Plaintiffs, using SR5.

56.     Keating never disclosed to Allied World or USFIC the enterprise he and Cohen used to enrich themselves, the kickbacks Keating must have received from Cohen, P.A., or any ownership stake in Kodiak that Keating must have had.  Keating failed to make these disclosures despite being required to do so by Allied World and USFIC internal policies, as well as by the fiduciary duties Keating owed to his employers.  As he withheld this critical information, he approved payment requests from Cohen, P.A. and Kodiak on claims he was handling on behalf of Allied World, which Allied World duly paid.  If Allied World had known any of this information, it would not have paid those invoices.

57.     Cohen not only participated in the operation and management of the enterprise to enrich himself and Keating at Plaintiffs' expense, he actively aided and abetted Keating's breach of fiduciary duties.  Cohen knew that the money Cohen, P.A. and Kodiak must have paid to SR5 would end up in Keating's pocket.  Despite this knowledge, Cohen actively facilitated Keating's breach of fiduciary duty through the kickbacks Cohen, P.A. must have paid to Keating, and the inflated fees Kodiak took from Allied World and must have passed through to Keating.

58.     The Cohen Defendants also never disclosed to Allied World the enterprise Keating and Cohen formed to enrich themselves, the kickbacks Keating must have received from Cohen,

14

P.A., or any ownership interest Keating must have had in Kodiak.  The Cohen Defendants failed to disclose these facts despite being required to do so by the fiduciary duties they owed to Allied World.

59.    Allied World's claims against the Cohen Defendants arise directly out of their contacts with Pennsylvania.  Cohen is a Pennsylvania-licensed attorney.  He and other personnel at Cohen, P.A. had innumerable phone calls and sent over 2,000 emails directly to Keating while he was working at Allied World's and USFIC's Philadelphia offices.  Upon information and belief, the Cohen Defendants sent numerous checks to Keating (through SR5) in Pennsylvania via interstate mail, and, upon further information and belief, Keating deposited those checks into a Pennsylvania bank account.  Upon further information and belief, Cohen also caused Kodiak to direct tens of thousands of dollars to Keating (through SR5) via interstate mail and wire transfers, which Keating then used for his own personal benefit in Pennsylvania.

**Keating Scams Allied World By Creating A Phony Company—American Construction—And By Authorizing Payments For Fictitious Work**

60.    Keating saved his most brazen scam for last.  Beginning in late 2017 or early 2018, Keating began to create fake contracts and invoices purportedly evidencing work performed by a company called American Construction.  Keating then uploaded and submitted these documents to Allied World for payment with his approval to Allied World's operations team in Connecticut.

61.    Between January 2018 and December 2020, Allied World made 51 separate payments via interstate mail and wire authorized by Keating to American Construction on dozens of surety bonds that were the subject of otherwise legitimate claims.  In total, Keating caused Allied World to pay American Construction at least $1,000,750.

62.    In reality, however, all of the paperwork Keating submitted to support payments to American Construction was bogus.  American Construction never performed the work for which

it billed Allied World. Indeed, American Construction, which Keating created in January 2018 using SR5 as the company's organizer, was nothing more than a vehicle for fraud.

63. Upon information and belief, American Construction transferred the proceeds of this fraud to Keating through SR5.

**Keating And Sian Keating Use SR5 Funds For Their Own Personal Benefit**

64. Upon information and belief, Keating used SR5 to channel over $1 million of fraudulent payments and kickbacks into his and his wife's pockets over course of the seven years he was employed by Plaintiffs.

65. Upon information and belief, Keating and Sian Keating used all of the money paid to SR5 for their own venal purposes. For example, Keating and Sian Keating used fraudulent proceeds paid through SR5 to remodel their kitchen

**Defendants' Deception Prevents Allied World From Discovering Their Misconduct**

66. Defendants went to great lengths to conceal their wrongdoing. They created multiple bogus companies to disguise their misdeeds and prevent Allied World from detecting Keating's receipt of kickbacks and fraudulent payments. Keating attempted to delete from Allied World's claim files all records showing his approval of payments to American Construction. Keating also scrupulously avoided discussions of SR5 on his company emails.

67. Defendants' fraudulent concealment worked. Plaintiffs only discovered Keating's American Construction scheme in late 2020. Once Plaintiffs finally uncovered this wrongdoing, USFIC fired Keating on January 7, 2021.

68. Even after firing Keating, the remaining Defendants might have escaped accountability if Plaintiffs had not continued their investigation into Keating's company emails and claim files, and obtained discovery of Keating's bank records in the Connecticut Action. As

16

Plaintiffs' investigation continues, additional wrongdoing may well be uncovered, either by Defendants in this action, or by other parties.

69.  Even now, Keating and Cohen are taking steps to conceal their embezzlement. Keating has closed out the bank accounts of SR5 and American Construction. On March 16, 2021, Cohen dissolved Kodiak. And on January 22, 2021—mere days after Keating was fired—Cohen transferred ownership of his home into a trust.

70.  Because Defendants have taken affirmative and intentional steps to conceal their misconduct and the injuries they have caused to Plaintiffs, all applicable statutes of limitations have been tolled.

**FIRST CAUSE OF ACTION**
**Civil RICO, 18 U.S.C. § 1962(c)**
*(against Keating, Cohen, and Cohen, P.A.)*

71.  Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

**The SR5 Enterprise**

72.  The RICO "enterprise" that engaged in the commission of the unlawful and fraudulent schemes described above was SR5—an entity that, upon information and belief, Keating created solely for the purpose of defrauding Plaintiffs (the "SR5 Enterprise").

73.  The SR5 Enterprise existed for the sole purpose of defrauding and embezzling from Plaintiffs, and defrauding them of the honest services that Keating and the other Defendants were obligated to provide. Upon information and belief, the proceeds of the SR5 Enterprise were distributed to Defendants in the form of kickbacks, work assigned in exchange for kickbacks, and fraudulent requests for payments from Allied World.

74.  The SR5 Enterprise engaged in racketeering activity as defined in 18 U.S.C. § 1961(1). The SR5 Enterprise's racketeering activities affected interstate commerce through,

17

among other things, transacting business with various parties located in Pennsylvania, Delaware, New York, and Florida as part of its fraudulent scheme to embezzle thousands of dollars from Plaintiffs, which are Delaware and New Hampshire entities based in New York and New Jersey, and operating across multiple states.

**Participation In The SR5 Enterprise Through A Pattern Of Racketeering Activity**

75.     Upon information and belief, together with the Cohen Defendants, Keating participated in the operation and management of the SR5 Enterprise through a continuing pattern of fraudulent and unlawful activities in violation of 18 U.S.C. § 1962(c) over the course of at least seven years including, without limitation:

a.     Forming SR5 for the sole purpose of defrauding Plaintiffs and conducting the SR5 Enterprise's operations from SR5's headquarters at his home address;

b.     Soliciting and accepting kickbacks from the Cohen Defendants and assigning them work in exchange (at least in part) for those illicit payments;

c.     Concealing the SR5 Enterprise's illicit scheme by (i) falsely representing to Plaintiffs that American Construction and Kodiak were legitimate businesses instead of companies that Keating himself owned; and (ii) concealing that the work he distributed to the Cohen Defendants and Kodiak was procured in exchange for kickbacks;

d.     Fraudulently overbilling for services performed by Kodiak, which were in fact nothing more than LexisNexis searches rebranded with a Kodiak cover page and marked up to an exorbitant extent;

e.     Conspiring with Cohen to fend off scrutiny by Allied World into Cohen's fraudulent overbilling;

18

f.    Creating and submitting bogus contracts, invoices, and other paperwork to support fraudulent payments to American Construction that were ultimately funneled back to the SR5 Enterprise as illicit profits used to pay personal expenses;

g.    Exploiting the trust and authority Plaintiffs delegated to him, as well as his knowledge of the claims-handling process, to (i) submit false invoices from companies that he secretly owned for work that they had not performed; (ii) using the SR5 Enterprise to conceal fraudulent transactions, sequester and distribute illicit profits, and distribute work to the Cohen Defendants in exchange for kickbacks;

h.    Making and directing interstate wire payments and mailings between and among the Defendants involved in the SR5 Enterprise's fraudulent activities and in furtherance of its unlawful objectives;

i.    Recruiting and conspiring with the Cohen Defendants to participate in the fraudulent and unlawful activities conducted by and through the SR5 Enterprise; and

j.    Authorizing over a million dollars in bogus payments acting as a claims handler on Allied World surety bonds without revealing these facts to Plaintiffs.

76.    Upon information and belief, together with Keating, the Cohen Defendants participated in the operation and management of the SR5 Enterprise through the commission of

19

multiple acts of fraud and other unlawful conduct in violation of 18 U.S.C. § 1962(c), including, among other things:

a.  Forming Kodiak as a joint venture with Keating and serving as its president in furtherance of the SR5 Enterprise's scheme to embezzle funds from Plaintiffs and defraud them of honest services;

b.  Using personnel and resources of Cohen, P.A. to operate Kodiak;

c.  Failing to disclose Keating and Cohen's ownership interest in Kodiak and purposefully concealing those relationships and their role in the SR5 Enterprise's fraudulent activities;

d.  Manipulating and exerting control over the SR5 Enterprise through the payment of kickbacks in exchange for work for Allied World that Keating illicitly procured for Cohen, P.A. and Kodiak;

e.  Directing interstate mailings and wire payments to Keating and SR5 in connection with the SR5 Enterprise's fraudulent activities;

f.  Conspiring with Keating to fend off scrutiny by Allied World into Cohen's fraudulent overbilling;

g.  Participating in meetings and discussions regarding the SR5 Enterprise and its operations; and

h.  Directing the dissolution of Kodiak in order to conceal the SR5 Enterprise's illegal activity after Keating's illegal conduct was uncovered.

**Predicate Acts Of Mail And Wire Fraud (Including Honest Services Fraud), And Money Laundering**

77.  The pattern of racketeering activity that Keating and the Cohen Defendants knowingly and willfully engaged in includes mail and wire fraud in violation of 18 U.S.C. §§ 1341

20

and 1343. These Defendants committed these predicate acts as part of the SR5 Enterprise and in furtherance of its scheme to (1) defraud and embezzle funds from Plaintiffs and (2) defraud Plaintiffs of the honest services of Keating and the Cohen Defendants, each of whom owed Plaintiffs fiduciary duties, in violation of 18 U.S.C. § 1346.

78.   To accomplish this fraudulent scheme, the SR5 Enterprise (among other things) used Kodiak to bill double the cost for services that were already being provided by Allied World's existing vendor. Kodiak's services were also nothing more than re-branded LexisNexis reports, which Kodiak procured at a small fraction of the fee it billed to Allied World.

79.   Plaintiffs were unaware of these facts, which Keating and the Cohen Defendants— as fiduciaries of Plaintiffs—were required to disclose. If Plaintiffs had known of these facts, they would not have permitted the use of Kodiak for these services.

80.   As a result of the SR5 Enterprise's fraudulent scheme, Allied World made at least 108 payments to Kodiak totaling at least $339,950.39 between March 2017 and December 2020. Of that amount, upon information and belief, Kodiak transferred over $100,000 to Keating through SR5 between May 2017 and February 2020.

81.   The SR5 Enterprise also accomplished its fraudulent scheme through American Construction—a bogus company created by Keating, using SR5. Keating created and uploaded false contracts and other documentation into Allied World's claims-handling system and requested that payments be issued to American Construction. Unaware of this deception, Allied World issued checks for the requested amount and mailed these checks to American Construction. After Keating deposited the checks into American Construction's bank account, upon information and belief, American Construction then funneled that money to Keating through SR5's bank account.

21

82.     Keating repeated this process over 50 times as part of the Enterprise's scheme to embezzle over $1 million in funds from Plaintiffs between January 2018 and December 2020, including after Keating was transferred to USFIC.

83.     In addition, Keating and the Cohen Defendants reached another illicit agreement in which Keating assigned a substantial volume of work on surety claims Keating handled for Allied World—which generated payments from Allied World totaling more than $6.1 million.  Upon information and belief, these entities paid hundreds of thousands of dollars in kickbacks to Keating in exchange (at least in part) for the work Keating secured for these entities.  Despite their obligation to do so, none of these entities ever disclosed this agreement—or the related payments Keating received, upon information and belief, through SR5—to Plaintiffs.  Had Allied World been aware of this agreement, it never would have retained these firms to work on its behalf.

84.     Through this conduct, Keating and the Cohen Defendants each intentionally and willfully conspired and participated in mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and in honest services fraud in violation of 18 U.S.C. § 1346 as a part of the pattern of racketeering activities that the SR5 Enterprise engaged in over the course of seven years.

85.     It was reasonably foreseeable to Keating and the Cohen Defendants that the mail and wires would be used in furtherance of this fraud, and the mails and wires were in fact used to further and execute the scheme.  The nature of the SR5 Enterprise and its fraudulent activities necessarily entailed frequent wire and mail transmissions.  Upon information and belief, Keating and the Cohen Defendants each regularly transmitted and caused to be transmitted information, electronic data, and funds by interstate wire, and also regularly caused information and documents, including checks, to be sent and delivered by interstate mail.  Each electronic and postal transmission was incident to an essential part of the scheme, and each such electronic and postal

22

transmission constituted a predicate act of wire and or mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.

86.    The pattern of racketeering activity that Keating and the Cohen Defendants knowingly and willfully engaged in as part of the Enterprise also included money laundering in violation of 18 U.S.C. § 1956(1).

87.    Upon information and belief, Keating and the Cohen Defendants each knowingly caused, directed, and conducted numerous financial transactions that involved the proceeds of unlawful activities—including, specifically, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and honest services fraud in violation of 18 U.S.C. § 1346.  They each did so knowing that each such transaction involved the proceeds of the pattern of racketeering activities in which they engaged through the SR5 Enterprise in violation of 18 U.S.C. § 1962(c), with the intent to promote the carrying on of the aforesaid unlawful activities, and knowing that each such transaction was designed in whole or in part to conceal or disguise its fraudulent nature and the source, ownership, or control of the proceeds of that unlawful activity.

88.    Each transaction constitutes a predicate act of money laundering—which, together, constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  As with the predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and honest services fraud in violation of 18 U.S.C. § 1346, these transactions were not isolated events, but related acts aimed at the common purpose and goal of the SR5 Enterprise to embezzle millions of dollars of Plaintiffs' funds and defraud them of the intangible value of honest services of Keating and the Cohen Defendants.

89.    These predicate acts constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  They were not isolated events, but related acts aimed at the common purpose

23

and goal of embezzling millions of dollars of Plaintiffs' funds, defrauding them of the intangible value of honest services through kickbacks, and concealing these illicit gains by laundering these funds through intermediaries.  The SR5 Enterprise was the means to that end, providing Keating and the Cohen Defendants with a common vehicle through which they could (and did) embezzle, transfer, sequester, distribute, and conceal the illicit proceeds of their fraud.

90.    If Plaintiffs had not discovered the SR5 Enterprise's fraud and terminated Keating in January 2021, the SR5 Enterprise would no doubt have continued to defraud Allied World for years to come.

**Injury To Plaintiffs**

91.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Keating and the Cohen Defendants, Plaintiffs have suffered injury to their business and property within the meaning of 18 U.S.C. § 1964(c), including: thousands of dollars fraudulently overbilled by Kodiak and the Cohen Defendants; more than a million dollars embezzled by American Construction; hundreds of thousands of dollars in kickbacks paid to Keating (upon information and belief); and the value of each of these Defendants' honest services.

92.    Pursuant to 18 U.S.C. § 1964(c), Keating and the Cohen Defendants are each jointly and severally liable to Plaintiffs for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**<u>SECOND CAUSE OF ACTION</u>**
**Civil RICO, 18 U.S.C. § 1962(c)**
***(against Keating, Cohen, and Cohen, P.A.)***

93.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

24

**The Keating-Cohen Enterprise**

94.     In addition to the enterprise alleged above, Keating and the Cohen Defendants formed an association-in-fact to perpetrate their unlawful and fraudulent schemes (the "Keating-Cohen Enterprise").  Each constituent of the Keating-Cohen Enterprise is a "person" as defined by 18 U.S.C. §§ 1961(3) and 1962(c), and the Enterprise was separate and distinct from each such person.

95.     The entity and individuals that constituted the Keating-Cohen Enterprise were associated for the common purpose of embezzling from Plaintiffs and defrauding them of the honest services that Keating and the Cohen Defendants were obligated to provide.  Upon information and belief, the proceeds of the Keating-Cohen Enterprise were distributed by and among its constituents, including through Keating's and Cohen's joint ownership of Kodiak.

96.     The Keating-Cohen Enterprise engaged in racketeering activity as defined in 18 U.S.C. § 1961(1).  The Keating-Cohen Enterprise's racketeering activities affected interstate commerce through, among other things, transacting business with various parties located in Pennsylvania, Delaware, and Florida as part of its fraudulent scheme to embezzle thousands of dollars from Plaintiffs, which are Delaware and New Hampshire entities based in New York and New Jersey, and operating across multiple states.

**Participation In The Keating-Cohen Enterprise Through A Pattern Of Racketeering Activity**

97.     Together with the Cohen Defendants, Keating conducted the affairs of the Keating-Cohen Enterprise through a continuing pattern of fraudulent and unlawful activities over the course of at least seven years.  Upon information and belief, Keating participated in the operation and management of the Keating-Cohen Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), including, without limitation:

25

a.  Forming SR5 for the sole purpose of defrauding Plaintiffs and conducting the Keating-Cohen Enterprise's operations from SR5's headquarters at his home address;

b.  Concealing the Keating-Cohen Enterprise's illicit scheme by (i) falsely representing to Plaintiffs that American Construction and Kodiak were legitimate businesses instead of businesses that Keating himself owned; and (ii) failing to disclose that the work he distributed to the Cohen Defendants and Kodiak were procured in exchange for kickbacks;

c.  Fraudulently overbilling for services performed by Kodiak, which were in fact nothing more than LexisNexis searches rebranded with a Kodiak cover page and marked up to an exorbitant extent;

d.  Conspiring with Cohen to fend off scrutiny by Allied World into Cohen's fraudulent overbilling;

e.  Creating and submitting bogus contracts, invoices, and other paperwork to support fraudulent payments to American Construction that were ultimately funneled back to the Keating-Cohen Enterprise as illicit profits used to pay personal expenses;

f.  Exploiting the trust and authority Plaintiffs delegated to him, as well as his knowledge of the claims-handling process, to (i) submit false invoices from companies that he secretly owned for work that they had not performed; (ii) using the Keating-Cohen Enterprise to conceal fraudulent transactions, sequester and distribute illicit profits, and secure work for the Cohen

26

> Defendants, Kodiak, and American Construction in exchange for kickbacks;

g. Making and directing payments and mailings between the various entities and individuals involved in the Keating-Cohen Enterprise's fraudulent activities and in furtherance of its unlawful objectives;

h. Recruiting and conspiring with Cohen and Cohen, P.A. to participate in the fraudulent and unlawful activities conducted by and through the Keating-Cohen Enterprise; and

i. Authorizing over a million dollars in bogus payments acting as a claims handler on Allied World surety bonds without revealing these facts to Plaintiffs.

98. Upon information and belief, along with Keating, the Cohen Defendants participated in the operation and management of the Keating-Cohen Enterprise through the commission of multiple acts of fraud and other unlawful conduct in violation of 18 U.S.C. § 1962(c), including, among other things:

a. Forming Kodiak, upon information and belief, as a joint venture with Keating and serving as its president in furtherance of the Keating-Cohen Enterprise's scheme to embezzle funds from Plaintiffs and defraud them of honest services;

b. Using personnel and resources of Cohen, P.A. to operate Kodiak;

c. Failing to disclose Keating and Cohen's ownership interest in Kodiak and purposefully concealing those relationships and their role in the Keating-Cohen Enterprise's fraudulent activities;

27

d.    Directing mailings to and among the various entities in connection with the Keating-Cohen Enterprise's fraudulent activities;

e.    Manipulating and exerting control over the Keating-Cohen Enterprise through the payment of kickbacks in exchange for work with Plaintiffs that Keating illicitly procured for Cohen, P.A. and Kodiak;

f.    Conspiring with Keating to fend off scrutiny by Allied World into Cohen's fraudulent overbilling;

g.    Participating in meetings and discussions regarding the Enterprise and its operations; and

h.    Directing the dissolution of Kodiak in order to conceal the Keating-Cohen Enterprise's illegal activity after Keating's illegal conduct was uncovered.

**Predicate Acts Of Mail And Wire Fraud (Including Honest Services Fraud), And Money Laundering**

99.    The pattern of racketeering activity that Keating and the Cohen Defendants knowingly and willfully engaged in includes mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Keating and the Cohen Defendants committed these predicate acts as part of the Keating-Cohen Enterprise and in furtherance of its scheme to (1) embezzle funds from Plaintiffs and (2) defraud Plaintiffs of the honest services of Keating (as Plaintiffs' employee), and other individuals and entities who owed Plaintiffs fiduciary duties, including the Cohen Defendants, in violation of 18 U.S.C. § 1346.

100.    To accomplish this fraudulent scheme, the Keating-Cohen Enterprise created Kodiak and billed its services at double the cost of the existing vendor Allied World used for the same services. Kodiak's services were also nothing more than re-branded LexisNexis reports, which Kodiak procured at a small fraction of the fee it billed to Allied World.

28

101.    Allied World was unaware of these facts, which Keating and Cohen (as fiduciaries of Allied World) were required to disclose.  If Allied World had known of these facts, as well as Keating's and Cohen's ownership interest in Kodiak, it would not have permitted the use of Kodiak for these services.

102.    As a result of the Keating-Cohen Enterprise's fraudulent scheme, Allied World made at least 108 payments to Kodiak totaling at least $339,950.39 between March 2017 and December 2020.  Of that amount, upon information and belief, Kodiak transferred over $100,000 to Keating through SR5 between May 2017 and February 2020.  Presumably, the remaining Kodiak funds were transferred to Cohen, as Keating and Cohen were equal partners in their ownership of Kodiak.

103.    The Keating-Cohen Enterprise also accomplished its fraudulent scheme through American Construction—a bogus company created by Keating through SR5.  Keating created and uploaded false contracts and other documentation into Allied World's claims-handling system and requested that payments be issued to American Construction.  Unaware of this deception, Allied World issued checks for the requested amount and mailed these checks to American Construction. After Keating deposited a check into American Construction's bank account, upon information and belief, American Construction then funneled that money to Keating through SR5's bank account.

104.    Keating repeated this process over 50 times as part of the Keating-Cohen Enterprise's scheme to embezzle over $1 million in funds from Plaintiffs between January 2018 and December 2020, including after Keating was transferred to USFIC.

105.    In addition, Keating and the Cohen Defendants reached another illicit agreement in which Keating directed a substantial volume of work on surety claims Keating handled for Allied

29

World to the Cohen Defendants.  Upon information and belief, in exchange for the work Keating secured for the Cohen Defendants—which generated payments from Allied World totaling approximately $3.5 million—the Cohen Defendants paid hundreds of thousands of dollars in kickbacks to Keating (through SR5's bank account) during the more-than five years when Cohen represented Allied World.  Upon information and belief, those funds were ultimately pocketed by Keating.  Despite their obligation to do so, neither Keating nor the Cohen Defendants ever disclosed this agreement—or the related payments Keating received, upon information and belief, through SR5—to Plaintiffs.

106.    Through this conduct, Keating and the Cohen Defendants each intentionally and willfully conspired and participated in mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and in honest services fraud in violation of 18 U.S.C. § 1346 as a part of the pattern of racketeering activities that the Keating-Cohen Enterprise engaged in over the course of at least three years.

107.    It was reasonably foreseeable to Keating and the Cohen Defendants that the mail and wires would be used in furtherance of this fraud, and the mail and wires were in fact used to further and execute the scheme.  The nature the Keating-Cohen Enterprise and its fraudulent activities necessarily entailed frequent wire and mail transmissions.  Upon information and belief, Keating and the Cohen Defendants each regularly transmitted and caused to be transmitted information, electronic data, and funds by interstate wire, and also regularly caused information and documents, including checks, to be sent and delivered by interstate mail.  Each electronic and postal transmission was incident to an essential part of the scheme, and each such electronic and postal transmission constituted a predicate act of wire and or mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.

30

108. The pattern of racketeering activity that Keating and the Cohen Defendants knowingly and willfully engaged in as part of the Keating-Cohen Enterprise also included money laundering in violation of 18 U.S.C. § 1956(1).

109. Upon information and belief, Keating and the Cohen Defendants each knowingly caused, directed, and conducted numerous financial transactions that involved the proceeds of unlawful activities—including, specifically, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and honest services fraud in violation of 18 U.S.C. § 1346. They each did so knowing that each such transaction involved the proceeds of the pattern of racketeering activities in which they engaged through the Keating-Cohen Enterprise in violation of 18 U.S.C. § 1962(c), with the intent to promote the carrying on of the aforesaid unlawful activities, and knowing that each such transaction was designed in whole or in part to conceal or disguise its fraudulent nature and the source, ownership, or control of the proceeds of that unlawful activity.

110. Each transaction constitutes a predicate act of money laundering—which, together, constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). As with the predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and honest services fraud in violation of 18 U.S.C. § 1346, these transactions were not isolated events, but related acts aimed at the common purpose and goal of the Keating-Cohen Enterprise to embezzle millions of dollars of Plaintiffs' funds and defraud them of the intangible value of honest services of Keating and the Cohen Defendants, and of other individuals and entities who performed services for Plaintiffs in a fiduciary capacity.

111. These predicate acts constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). Upon information and belief, these predicate acts were not isolated events, but related acts aimed at the common purpose and goal of embezzling millions of dollars of

31

Plaintiffs' funds, defrauding them of the intangible value of honest services through kickbacks, and concealing these illicit gains by laundering these funds through intermediaries.  The Keating-Cohen Enterprise was the means to that end, providing Keating and the Cohen Defendants with a common vehicle through which they could (and did) embezzle, transfer, sequester, distribute, and conceal the illicit proceeds of their fraud.

112.    If Plaintiffs had not discovered the Keating-Cohen Enterprise's fraud and terminated Keating in January 2021, the Keating-Cohen Enterprise would no doubt have continued to defraud Allied World for years to come.

**Injury To Plaintiffs**

113.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Keating, the Cohen Defendants, and SR5, Plaintiffs have suffered injury to their business and property within the meaning of 18 U.S.C. § 1964(c), including, thousands of dollars fraudulently overbilled by Kodiak and the Cohen Defendants, more than a million dollars embezzled by American Construction, hundreds of thousands of dollars in kickbacks paid to Keating (upon information and belief), and the value of Keating's and the Cohen Defendants' honest services.

114.    Pursuant to 18 U.S.C. § 1964(c), Keating and the Cohen Defendants are each jointly and severally liable to Plaintiffs for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**
**RICO Conspiracy, 18 U.S.C. § 1962(c), (d)**
***(against Keating, Cohen, and Cohen, P.A.)***

115.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

116.    Keating and the Cohen Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

32

117. At all relevant times, Keating and the Cohen Defendants were each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c)-(d).

118. As set forth above, Keating formed numerous enterprises with the Cohen Defendants and participated in those enterprises' operation and management through a pattern of racketeering activities in violation of 18 U.S.C. § 1962(c) for the purpose of embezzling millions of dollars from Plaintiffs and defrauding them of the honest services that Keating and the other Defendants were obligated to provide. In doing so, these enterprises engaged in, and its activities affected, interstate commerce as defined in 18 U.S.C. § 1962(c).

119. Keating and the Cohen Defendants each agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct and affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Among other things, the Cohen Defendants and (upon information and belief) Keating agreed to form and operate Kodiak for the purpose of defrauding Plaintiffs.

120. As a direct and proximate result of the overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs have suffered injury to their business and property within the meaning of 18 U.S.C. § 1964(c), including, thousands of dollars fraudulently overbilled by Kodiak and the Cohen Defendants, and more than a million dollars embezzled by American Construction.

121. Pursuant to 18 U.S.C. § 1964(c), Keating and the Cohen Defendants are each jointly and severally liable to Plaintiffs for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

33

**FOURTH CAUSE OF ACTION**
**Fraud**
(*against Keating, Cohen, and Cohen, P.A.*)

122. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

123. To accomplish the fraudulent scheme described above, Keating and the Cohen Defendants made numerous material misrepresentations and repeatedly concealed material facts from Plaintiffs. Upon information and belief, these fraudulent misrepresentations and omissions include:

    a. Purposefully concealing from Plaintiffs that Cohen and Keating owned and controlled Kodiak and that Cohen served as its president;

    b. Failing to disclose the personal advantage Cohen obtained from the $339,950.39 Kodiak received in payments from Plaintiffs through his beneficial interest in that entity;

    c. Concealing Kodiak's fraudulent overbilling from Plaintiffs;

    d. Concealing the kickbacks the Cohen Defendants were paying to Keating in exchange (at least in part) for work; and

    e. Concealing the fraudulent overbilling the Cohen Defendants must have engaged in to recoup the kickbacks they paid to Keating.

124. Keating and the Cohen Defendants had a duty to fully and fairly disclose all material conflicts, including the truth as to their relationships with Keating and their knowledge of Keating's misconduct, and to act in Plaintiffs' best interests at all relevant times. These Defendants were also prohibited from obtaining a personal advantage over Plaintiffs, and from placing themselves in an adverse position to Plaintiffs.

125.    Keating and the Cohen Defendants knew that these misrepresentations and omissions were false at the time they were made to Plaintiffs, and with the intention that Plaintiffs would rely on them in, among other things, paying millions of dollars what Plaintiffs believed were legitimate companies performing legitimate services through honestly procured contracts and engagements.

126.    Plaintiffs reasonably relied on these misrepresentations and omissions based on the trust and confidence they had placed in Keating, as their employee and fiduciary, and the Cohen Defendants, as their attorney and fiduciary.

127.    As a result of this deception, Plaintiffs paid more than $330,000 for work that should have been billed at a fraction of that price, and incurred other damages in the course of this scheme, including through Plaintiffs' efforts to uncover and prosecute the fraud that Keating and the Cohen Defendants perpetrated against them.

128.    The efforts of Keating and the Cohen Defendants to disguise this fraud over the course of multiple years reveal, among other things, that these Defendants acted with actual malice and a wanton and willful disregard for Plaintiffs' rights.

129.    For all of these reasons, Plaintiffs are entitled to actual damages in an amount to be determined at trial, and are further entitled to punitive damages in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
**Breach of Fiduciary Duty**
*(against Keating)*

130.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

131.    Allied World hired Keating in February 2014 to act as an Assistant Vice President and licensed attorney, overseeing surety claims.  When Allied World's surety business was transferred to USFIC, in July 2019, Keating remained in this role.  Throughout his employment

35

by Plaintiffs, Keating owed them fiduciary duties, including the duty of loyalty, good faith, and fair dealing.

132.    Plaintiffs placed their trust and confidence in Keating, and Keating was obligated to fully and fairly disclose all material conflicts of interest and to act in Plaintiffs' best interests at all times.  Keating was also prohibited from obtaining a personal advantage over Plaintiffs, and from placing himself in an adverse position to Plaintiffs.

133.    Keating abused his position of trust and violated the fiduciary duties he owed to Plaintiffs.  Upon information and belief, Keating breached his duty of loyalty by misrepresenting and concealing numerous material facts from Plaintiffs, and by depriving Plaintiffs of his honest services, including by:

      a.    Purposefully concealing from Plaintiffs that Keating was assigning work worth millions of dollars to the Cohen Defendants in exchange for hundreds of thousands of dollars in kickbacks;

      b.    Purposefully concealing from Plaintiffs that Keating was purportedly moonlighting for a competitor insurance company, during which he would have inevitably disclosed Allied World trade secrets, including pricing information;

      c.    Purposefully concealing that Keating owned and controlled Kodiak and failing to disclose the personal advantage Keating obtained from the $339,950.39 in payments that Keating approved on behalf of Allied World;

      d.    Falsely representing that Kodiak was a legitimate company and concealing the fraudulent nature of the transactions Plaintiffs entered into with Kodiak;

36

e.    Purposefully concealing that American Construction was a bogus company that Keating owned, and approving over $1 million in fraudulent payments to that entity; and

f.    Failing to disclose to Plaintiffs that Keating was misappropriating company assets and embezzling funds from Plaintiffs.

134.    Plaintiffs have suffered actual harm as a result of Keating's breaches of fiduciary duties, including the fraudulent payments Keating approved to Kodiak and American Construction, being deprived of the honest services of Keating as Plaintiffs' employee, and the cost of investigating and prosecuting Keating's misconduct.

135.    As a result, Plaintiffs are entitled to actual damages in an amount to be proven at trial.  Plaintiffs are further entitled to disgorgement of all compensation they paid to Keating in connection with his faithless and disloyal conduct.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
*(against Cohen and Cohen, P.A.)*

136.    Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

137.    As set forth above, Plaintiffs retained the Cohen Defendants—a law firm and a licensed attorney—as their legal counsel in connection with numerous surety claims-related matters between May 2015 and January 2021.  In this capacity, the Cohen Defendants owed fiduciary duties to Plaintiffs, including the duty of loyalty, good faith, and fair dealing.

138.    Plaintiffs placed their trust and confidence in the Cohen Defendants, and the Cohen Defendants were obligated to fully and fairly disclose all material conflicts and to act in Plaintiffs' best interests at all times while an attorney-client relationship existed between them.  The Cohen

37

Defendants were also prohibited from obtaining a personal advantage over Plaintiffs, and from placing themselves in an adverse position to Plaintiffs.

139.    The Cohen Defendants abused their position of trust and violated the fiduciary duties they owed to Plaintiffs.  Upon information and belief, the Cohen Defendants breached their duty of loyalty by misrepresenting and concealing numerous material facts from Plaintiffs, and by depriving Plaintiffs of the honest services of their employee, including by:

a.    Purposefully concealing from Plaintiffs that the Cohen Defendants were paying hundreds of thousands of dollars of kickbacks to Keating in exchange for work assignments worth millions of dollars;

b.    Purposefully concealing from Plaintiffs that Cohen and Keating owned and controlled Kodiak and that Cohen served as its president, and failing to disclose the personal advantage Cohen obtained from the more than $330,000 Kodiak received in payments from Plaintiffs through his beneficial interest in that entity; and

c.    Falsely representing that Kodiak was a legitimate company and concealing the fraudulent nature of the transactions Plaintiffs entered into with Kodiak; and

d.    Failing to disclose to Plaintiffs that Keating was misappropriating company assets and embezzling funds from Plaintiffs.

140.    Plaintiffs have suffered actual harm as a result of the Cohen Defendants' breaches of fiduciary duties, including the payment of fraudulent claims submitted by Keating (including fraudulent payments to Kodiak), being deprived of the honest services of Keating as Plaintiffs'

38

employee, and the cost of investigating and prosecuting Keating's and the Cohen Defendants' misconduct.

141.     As a result, Plaintiffs are entitled to actual damages in an amount to be proven at trial.  Plaintiffs are further entitled to disgorgement of all compensation they paid to the Cohen Defendants in connection with their faithless and disloyal conduct.

## SEVENTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### (*against Keating, Cohen, and Cohen, P.A.*)

142.     Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

### Keating Aided and Abetted the Cohen Defendants' Breaches of Fiduciary Duty

143.     The Cohen Defendants each owed fiduciary duties to Plaintiffs pursuant to the attorney-client relationship that existed between Plaintiffs and the Cohen Defendants.

144.     The Cohen Defendants each willfully and deliberately breached the fiduciary duties they owed to Plaintiffs through numerous acts of misconduct.

145.     Keating was aware that the Cohen Defendants owed fiduciary duties to Plaintiffs, and was aware that they each willfully and deliberately breached that duty through numerous acts of misconduct.

146.     Keating gave substantial assistance and encouragement to the Cohen Defendants in effecting those breaches of fiduciary duty, and aided and abetted the Cohen Defendants in doing so.  Among numerous other misdeeds, upon information and belief, Keating deliberately allocated work to the Cohen Defendants and Kodiak (which was part-owned by Cohen) in exchange for unlawful kickbacks paid to him through SR5.

39

147.    Plaintiffs have suffered actual harm as a result of Keating's aiding and abetting these breaches of fiduciary duty by the Cohen Defendants, and Plaintiffs are entitled to damages in an amount to be determined at trial.

**The Cohen Defendants Aided and Abetted Keating's Breach of Fiduciary Duty**

148.    As set forth above, Keating owed fiduciary duties to Plaintiffs by virtue of his employment with Plaintiffs, and Keating willfully and deliberately breached that duty through numerous acts of misconduct.

149.    The Cohen Defendants were aware that Keating owed fiduciary duties to Plaintiffs by virtue of his employment.  The Cohen Defendants were aware that Keating willfully and deliberately breached that duty through numerous acts of misconduct.

150.    The Cohen Defendants gave substantial assistance and encouragement to Keating in effecting his various breaches of fiduciary duty, and aided and abetted the Keating in doing so, including, upon information and belief, by paying hundreds of thousands of dollars in secret kickbacks to Keating in exchange for work Keating allocated on behalf of Allied World, and by paying Keating a portion of the illicit profits of Kodiak.

151.    Plaintiffs have suffered actual harm as a result of the Cohen Defendants' aiding and abetting the aforesaid breach of fiduciary duty by Keating, and these Defendants are each jointly and severally liable to Plaintiffs for damages in an amount to be determined at trial.

<u>**EIGHTH CAUSE OF ACTION**</u>
**Negligent Misrepresentation**
(*against Keating, Cohen, and Cohen, P.A.*)

152.    Plaintiffs repeat and reallege the allegations in all of the preceding paragraphs as if fully set forth herein.

153. Keating and the Cohen Defendants made repeated misrepresentations to Plaintiffs during the course of their relationship—including by falsely representing to Plaintiffs that the Cohen Defendants had no conflicts in their work on behalf of Plaintiffs.

154. At the time Keating and the Cohen Defendants made these misrepresentations, each of them owed fiduciary duties to Plaintiffs pursuant to the attorney-client relationship that existed between Plaintiffs and Keating and the Cohen Defendants.

155. Keating and the Cohen Defendants failed to exercise due competence or care when making these misrepresentations to Plaintiffs.

156. Plaintiffs reasonably relied on these misrepresentations, and as a direct and proximate result, were defrauded of hundreds of thousands of dollars and were deprived of the honest services that their employees and agents were obligated to provide.

157. Plaintiffs have suffered actual harm as a result of the negligent misrepresentations of Keating and the Cohen Defendants, and these Defendants are each jointly and severally liable to Plaintiffs for damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### Unjust Enrichment
### (*against all Defendants*)

158. Plaintiffs repeat and reallege the allegations contained in all preceding paragraphs as if fully set forth herein.

159. Pursuant to the fraudulent scheme described above, Defendants have received, directly or indirectly, benefits from Plaintiffs to which there were not entitled.

160. Defendants were not entitled to these benefits, as, upon information and belief, they were procured through a fraudulent scheme to embezzle funds from Plaintiffs, to allocate work in exchange (at least in part) for illicit kickbacks, to breach fiduciary duties owed to Plaintiffs, and to conceal these misdeeds from Plaintiffs by channeling funds through SR5.

41

161.    Defendants were aware that the sums they received were the proceeds of these unlawful and fraudulent activities, and it would be unjust for Defendants to retain these benefits without payment.

162.    Accordingly, Plaintiffs are entitled to actual damages in amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**Conversion**
(*against Sian Keating*)

163.    Plaintiffs repeat and reallege the allegations in all of the preceding paragraphs as if fully set forth herein.

164.    Upon information and belief, Sian Keating—a sworn law enforcement officer—wrongfully and intentionally received thousands of dollars from SR5 in direct cash payments in exchange for bogus work she claimed to perform for SR5.  Sian Keating knew or should have known that SR5's funds were in fact the fruits of a fraudulent scheme to embezzle funds from Plaintiffs, and to enrich Keating through illicit kickbacks.

165.    Sian Keating has retained these funds without the consent of Plaintiffs and has deprived them of exercising control over the funds that belong to them, with the intent to do so permanently.

166.    Upon information and belief, these funds are specific and readily identifiable in the financial records of the fraudulent transactions, including falsified contracts and invoices Keating submitted, the corresponding checks and payments Plaintiffs issued, and the subsequent flow of these funds.

167.    As a direct and proximate result of Sian Keating's wrongful conversion, Plaintiffs are entitled to recover actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and respectfully request the following relief:

a.  Plaintiffs' actual damages in an amount to be determined at trial;

b.  Treble damages in an amount to be determined at trial;

c.  Punitive damages in an amount to be determined at trial;

d.  Disgorgement of all compensation and fees Plaintiffs paid to Defendants;

e.  Disgorgement of all payments the Cohen Defendants and other persons or entities paid to Keating;

f.  Pre- and post-judgment interest to the maximum extent permitted by law;

g.  Plaintiffs' attorneys' fees, costs, and expenses in this action, as well as all other incidental damages incurred by Plaintiffs to uncover and investigate Defendants' fraud and related misconduct; and

h.  Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated:   September 8, 2021
         Philadelphia, PA

_s/ Robert V. Dell'Osa_

Robert V. Dell'Osa
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000
RDellOsa@cozen.com

OF COUNSEL
Jane M. Byrne (*pro hac vice* forthcoming)
Guyon H. Knight (*pro hac vice* forthcoming)
Timothy Cramton (*pro hac vice* forthcoming)
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, NY 10173
(212) 547-5400
jbyrne@mwe.com
gknight@mwe.com
tcramton@mwe.com

*Attorneys for Plaintiffs Allied World
Insurance Company, Allied World Specialty
Insurance Company, Allied World National
Assurance Company, and United States Fire
Insurance Company*

44